Willard W. Cass, Jr., J.
These are actions brought by the Jamestown Urban Renewal Agency to condemn land in the Brooklyn Square area of Jamestown, New York. Answers have been interposed by the landowners which demand, among other relief, dismissal of the plaintiff’s petitions.
On September 15, 1971 evidence was taken before Hon. McKinley L. Phillips, Acting County Court Judge, upon a stipulated issue. As stated by Judge Phillips, the stipulation made by the parties reads as follows: ‘ ‘ It is hereby stipulated between the attorneys for the respective parties in each of the above entitled actions which are being tried at this time under the same evidence which are being tried together at this time, that the trial shall provide [sic; probably should be proceed] in two phases. Phase one shall be concerned only with proof as to the allegations contained in paragraph five of the complaint and that all proof in reference to said paragraph shall be offered at this time both on behalf of the plaintiff and the defendants and that thereafter, before proceeding further in the cases, that the Court shall make a decision as to whether or not the allegations of paragraph five have been sustained. After the Court has made its decision, phase two of the case will then be considered and the proceeding taken thereon, depending on the outcome of the decision of the Court as to phase one. Now, is that correct? mr. carpenter: It is so stipulated, mb. crossley: So stipulated.”
By paragraph five of the petitions the Jamestown Urban Renewal Agency has alleged: “ The plaintiff has been unable to reach agreement with the owner of the property for its purchase, despite diligent efforts at negotiation. A final offer by the plaintiff to purchase of [sic] the property by voluntary conveyance was made at the price offered, being that listed in paragraph 6, below. Upon information and belief, the defendants do not desire to make a voluntary conveyance of the property to the plaintiff under these terms.”
*261 The defendants ’ answers are as follows: 11 denies the allegations contained in paragraph 5 of the petition except that portion thereof that alleges the defendant corporation does not desire to make a voluntary conveyance of the property upon the terms offered.”[1]
The plaintiff Jamestown Urban Renewal Agency was created under the authority of a special legislative act (General Municipal Law, § 634). It is authorized by subdivision 1 of section 555 of the General Municipal Law to acquire property by condemnation pursuant to the Condemnation Law. (Section 4 of the Condemnation Law establishes what facts should be alleged in a petition, and by subdivision 5 prescribes that the following facts be set forth: “ That the plaintiff has been unable to agree with the owner of the property for its purchase, and the reason of such inability.” The courts of New York have recognized that, while there is no constitutional requirement that a statute conferring the power of eminent domain has to require an attempt to reach agreement before a proceeding be instituted (Matter of City of New York, 45 Misc. 184, 191, revd. on other grounds 104 App. Div. 445 [1905, First Dept.]), nevertheless a genuine effort to negotiate the purchase must be made by the condemning authority. (Matter of Lockport & Buffalo R. R. Co., 77 N. Y. 557, 563; Matter of County of Erie v. Lancaster Development Co., 232 App. Div. 331, 334 [1931, Fourth Dept.].) The effort made to agree does not need to be prolonged or involved. See Matter of Vil. of Middletown (82 N. Y. 196, 201) in which the court held: “It is quite evident that negotiations had gone far enough between the trustees and these parties to indicate that an agreement was impossible. The former were not called upon to name a price, when that fixed by Norbury was so extravagant as to amount, practically, to a refusal. An effort to agree is all that is required; not a series of efforts or a negotiation prolonged into a debate.” (See, also, Matter of Prospect Park & Coney Is. R. R. Co., 67 N. Y. 371, 377-378; Village of Waverly v. Waverly Water Co., 127 App. Div. 440 [1908, 3d Dept.], affd. upon certified question 194 N. Y. 545).
By a stipulation dated December 28, 1971 the parties have agreed: ‘ ‘ that the exhibits and the testimony already adduced in these cases shall be considered a part of the record before whatever judge is appointed to hear and determine the rest of *262 these causes, and that findings of fact and rulings of law may be made upon this written record in the same fashion as if the witnesses had been heard by the succeeding judge.”
Following the retirement of Hon. McKinley M. Phillips and the death of Hon. Edwin G. O’Connor, Chautauqua County Judge, I have been designated as Chautauqua County Judge. Upon a review of the written record in these proceedings, I make the following findings of fact.
LOUIS DIMAS CASE.
A representative of the plaintiff met with the defendant, Mr. Louis Dimas, on November 2, 1970, and offered to pay $24,000 for the property. Mr. Dimas rejected this offer. On November 3, a letter was sent to Mr. Dimas explaining certain relocation benefits to which he would be entitled. On November 18,1970, Mr. Dimas’ attorney contended that the amount offered appeared “grossly disproportionate to amounts offered on other properties within the project area” and asked for a review of the position stated on behalf of the agency in the letter of November 3, 1970. A review was made, including consideration of the appraisals made on the property and a review of the recommended price of the agency’s real estate consultant. On November 24, 1970, the attorney was advised that no error had been made in the position taken by the agency. On December 3, 1970, the attorney for Mr. Dimas met face to face with Mr. Nelson of the agency. A full scale discussion took place, including a consideration of the effect of the tax assessment of the property. On January 7, 1971, another contact was made on behalf of the agency with the attorney and with Mr. Dimas. On February 3, 1971, a letter was sent to Mr. Dimas making a final offer in writing, and including a five-page offer to sell to be executed by Mr. Dimas, should he desire to accept the agency’s last offer. The correspondence and memoranda kept by the agency, comprising seven separate documents together with the five-page offer introduced into evidence, fully support the dealings by the agency with Mr. Dimas and his attorney. The $24,000 offered to Mr. Dimas for his property was based on what the agency considered reliable appraisal values. Apparently, no clear counteroffer was made on behalf of Mr. Dimas. Mr. Nelson was of the impression that Mr. Dimas wanted in the neighborhood of $58,000 for the property.
HOLMLUND WALLPAPER AND PAINT COMPANY, INC. CASE.
The plaintiff’s negotiations with Holmlund Wallpaper and Paint Company, Inc. followed a course similar to that involved *263 in the Dimas case. The defendant’s president Mr. Evar Holmlund had asked Mr. Nelson of the Jamestown Urban Renewal Agency several times for an idea of the price that would be offered to him. By November 9, 1971, Mr. Nelson was able to give Mr. Holmlund a general idea of the acquisition price and relocation benefits. On February 4,1971, Mr. Holmlund met with Mr. Nelson, and he was offered $35,179 for the Holmlund property. At that conversation further relocation benefits were discussed. The interview was followed by a letter to Mr. Holmlund. On February 10 Mr. Holmlund informed the agency that he would be looking for a price of around $60,000. On the same day Mr. Nelson called Mr. Holmlund at his home and discussed the matter, particularly the effect of the tax assessment of the property upon the price to be offered. On March 12, 1971, Mr. Nelson called at Mr. Holmlund’s place of business and suggested to Mr. Holmlund that possibly the agency could increase its offer by 10% if Mr. Holmlund would be willing to settle for that amount. Mr. Holmlund rejected this offer. Mr. Nelson then informed Mr. Holmlund that probably the next step would be condemnation, which Mr. Holmlund at that time felt would probably be the best course. On March 24, 1971, the agency made a final offer to Mr. Holmlund by letter.
Again, the uncontroverted testimony of Mr. Nelson concerning the course of negotiations was fully supported by the documents in the agency’s file. The Holmlund concern received a five-page offer to sell, should the firm be willing to accept the price offered by the agency. This offer to sell included a nine-page appendix specifying the immovable fixtures which the agency was offering to purchase.
FEDERAL REGULATIONS.
The principal complaint of the defendants appears to arise from the policy followed by the Jamestown Urban Renewal Agency of offering the owner initially the full amount that the agency was authorized to pay and not thereafter departing from this initial offer. The policy on negotiations and the basis for this policy are set forth in the portion of the Urban Renewal Handbook admitted into evidence as Exhibit l.[2] The general *264 course of negotiations prescribed for a local public agency, such, as the Jamestown Urban Renewal Agency, with a property owner1 for the acquisition of real property shall, in general, ‘ ‘ be on the basis of offering the owner initially the full amount of the acquisition price determined by the LPA and concurred in by HUD to represent fair compensation for the property to be acquired ’ ’.
The handbook states the basis for the policy: 1 ‘ The principal purposes of the policy are (1) to protect the interests of property owners, especially the unsophisticated or poorly informed who have limited ability to negotiate with LPA representatives, and (2) to put all negotiations for the acquisition of real property on a basis that acknowledges and accepts the obligation of public entities to treat all owners fairly, impartially, and consistently in negotiating the acquisition of their properties.
“ The policy accepts as valid the principle that the owner of a property to be taken for a .public purpose generally should not be forced to bargain with an LPA to obtain an offer of the full amount determined with HUD concurrence, to represent the fair compensation for his property. The policy thus recognizes that a public entity armed with the power of eminent domain has a public duty, in its negotiations with owners, not only to protect the public interest, but also to safeguard the rights and interests of the owners.”
DECISION
The law requires that a condemnor conduct such negotiations with an owner of property as may reasonably result in agreement. The law does not require extended proceedings. All that the plaintiff was required to do has been virtually conceded in the defendants’ answers to have been done. In any event, full negotitaions were conducted. The testimony of Mr. Nelson and the documentary evidence established conclusively that reasonable effort was taken to acquire the defendants ’ property at the highest price considered reasonable by the plaintiff’s experts. The defendants rejected the plaintiff’s offers for the sole apparent reason that they were not satisfied with the sums offered. Clearly beneficial are the purposes of the Federally mandated policy of offering property owners at the outset of negotiations the full amount of the acquisition price as determined by the plaintiff and by the Department of Housing and Urban Development. A requirement that the plaintiff must offer a range of prices would, under the circumstances, lead to *265 an illusion of negotiation only. Accordingly, the plaintiff has sustained its burden of proof under paragraph 5 of the petitions. The condemnation actions should proceed to the next phase. This decision may be regarded as an interlocutory order.

. The quotations above are from the pleadings in Action No. 2, involving as a defendant Holmlund Wallpaper and Paint Company, Inc. The pleadings are in all material respects identical with those in Action No. 1, involving the defendant Louis Dimas.

. By sections 1441, 1456, 1460, 1465 of title 42 of the United States Code, the Secretary of Housing and Urban Development (see U. S. Code, tit. 42, § 3071, subd. [5]) is authorized to establish regulations governing urban renewal programs. In 34 Federal Register (pp. 1236, 1237) of January 25, 1969 the Secretary adopted regulations which give authority to the Urban Renewal Handbook in the following language: “ The policies and procedures applicable to urban renewal projects are set forth in the Urban Renewal Handbook (RHA 7200 through RHA 7228) ”.